Good morning, your honors. I'm Short and I'm Caitlin Shortell for Mr. Honeycutt. She's good now. Now you can see all of my thought processes. Okay, so we're here on behalf of Mr. Honeycutt to explain our two bases for appeal today. We argued in Mr. Honeycutt's appeal that the trial judge made two errors and abused his discretion. One, in denying the motion in limine to exclude the recording of the interrogation of the defendant by a trooper and second to in denying the trial. And so on the in the first argument, the argument was that the trial judge abused his discretion in denying the motion in limine because he failed to recognize how prejudicial the interrogation was. What's prejudicial about it? Well, Mr. Honeycutt, who could speak very politely, say when speaking to his lawyer, sounded like the worst thug on the planet in in his interrogation. He didn't say anything relevant to the crime that he was ultimately charged and convicted of. He just swore constantly at at the trooper and and so. Was it the fact that he used the f-word that makes it highly prejudicial? Is that the argument? He also, it was also the slang that he used. He really sounded like basically the theory of the prosecution throughout was that this was the sort of guy who would have done this sort of thing. And the way he, the way Mr. Honeycutt unwittingly spoke to the officer showed that he had no respect for law enforcement. And it made him sound like this is not a law abiding citizen. This is a little thug who hates law enforcement and isn't cooperative. However, it didn't include any anything relevant in terms of, you know, he he just repeatedly denied any knowledge which of some of the things that he was being accused of by the trooper. Here came more prejudice and confusion because the trooper was saying, we know you're involved in these things kind of vaguely. Theft and and drugs and Mr. Honeycutt just explosively denied that. So the district court suggested that it was relevant because he described his relationship with with Graham, the seller of the gun that was then contradicted by Graham's testimony. Why was that not a relevant element of the of the tape? Well, I think that it was I don't I don't recall that it was contradicted by Graham's testimony in terms of there was no dispute that that they had known one another through the sale of a car. But there was a big question as to whether or not Mr. Honeycutt knew that Mr. Graham was a guy who sold stolen goods and, you know, a longtime criminal that the prosecution tried to say everybody knew that that Mr. Graham was a criminal and sold stolen goods. And so, but I don't I don't recall that inconsistency or that there was a dispute about the there had been a used car sold by. So I thought that your client had said, well, I saw a flyer and I just went to the flyer and it was a sort of a garage sale of guns. And it was Graham who said, oh, I've known him for two or three years and have sold him things before. So that's what I think what the district court was focusing on. I recall that that the prosecutor stated that there was a recitation of the how they knew one another that Mr. Honeycutt did did maintain that he saw a flyer and that's how he went to purchase the gun. But there wasn't any dispute that there had been a flyer, actually. So by Mr. Graham and his testimony. And so nor was there a dispute that there had been a sale of a used car prior. So there was really no relevant, there was no need to put on this recording that basically was just a never ending stream of expletives and disrespect for the trooper, as well as the trooper statement. We know you're involved in this kind of thing. And it's our argument is that that the curative instruction really wasn't effective. It interlocked perfectly with the prosecution's argument, comments that the way that Mr. Honeycutt conducted himself was the way a guilty person would have behaved. And, and so is there anything else with regard to the motion in limine that you'd like to know about before I proceed? Your next issue was the new trial motion for a new trial. And so, um, so our argument for the motion for new trial was that the verdict was, um, had been contrary to the evidence. And we specifically were zeroing in on the element of whether Mr. Honeycutt knew or should have known that the firearm was the, Mr. Graham perjured himself or was mentally incompetent, um, in his testimony. And we described the multiple inconsistencies that Mr. Graham, in Mr. Graham's testimony, the fact that at one point he said, um, he was asked by the defense, do you, if you had a stolen 22, would you lie about it? And he said, yep. And he just, I mean, he didn't seem to know anything from one moment to the next. It was, um, and he did admit to be on, being on many medications and to having trouble remembering or understanding anything. He denied that he had any kind of, uh, agreement for his cooperation with the government until it was showed to him. Why doesn't that all just go to his credibility, to his believability, the weight of his testimony that the, that the jury would give to it? Well, I think that our argument was that he lied and, or I think none of us will ever know. He appeared to be so cognitively limited or troubled. And he also had a motivation. I can see how there's a part of this that is, um, you know, going back to questions about his credibility. And we, I had an submission of the, this case, US versus Neville, in which this court, um, does not allow the review of the credibility, um, judgments that the jury may have made, um, in looking at the sufficiency of the evidence. Um, but then again, another basis for our motion for a new trial was the prejudice that resulted in hearing the recording of the interrogation and the prosecutor's comments, um, which in during closing, which were really focused directly on this is the sort of guy I submit to you that if you were just a law abiding citizen, wouldn't you have wanted to help out the officer? Um, you know, this guy wasn't acting like that. And, um, I think that that was largely due to the unfortunate way that Mr. Honeycutt had of speaking to the trooper. And so, uh, again, even if we're unable to, um, you know, to ask this court to look at the, to say, how could anyone have believed Mark Graham, which was, it was a startling phenomenon that anyone would have believed him. And we really do, uh, this verdict was contrary to the evidence because that was the only evidence, um, submitted on the known or should have known besides comments again, by the prosecutor in closing, everybody knew that Mark Graham was a felon. Everybody knew, but that's not evidence. The prosecutor himself said his comments weren't evidence. So the only evidence that we had was Mr. Graham's flawed, inconsistent, baffling testimony. And, um, this prejudicial recording in which, um, we didn't believe that the curative instruction was effect, effective in making the jury not think again, listen to the way this hoodlum conducts himself. Um, and so as a result, um, we ask that the, the conviction be reversed. Thank you. A few minutes, a few seconds for rebuttal here from the court. May it please the court. My name is Joanne Farrington. I'm Assistant U.S. Attorney for the District of Alaska, and I represent the United States in this case. Um, there are two issues on this appeal, and the first involves whether or not the district court abused its discretion when it admitted a, a tape of the first encounter between the state troopers and Mr. Honeycutt after they had, um, tracked him down from a, the records of, of a, the pawning of a stolen rifle. Now here, he, he wasn't placed under arrest, and this was pre indictment. They're just asking him some questions. Is that right? That's right. They had, they, uh, he had pawned the stolen rifle. Um, the, the troopers had obtained his, uh, address and name and so forth from the pawn shop, and they went to talk to him about what he knew about this, uh, this stolen weapon. Something that bothers me about the admission of this, uh, recording is that he, he has decided to remain silent. That's right. And it's kind of cuts across the grain to then allow a recording, uh, which was a situation where he wasn't Mirandized, he wasn't yet indicted, to allow this, uh, to come in as evidence against him, which is, uh, troubling to me. I believe, Your Honor, that a voluntary out-of-court statement by a defendant is admissible, um, even if the defendant chooses to exercise his rights not to take the stand at his discretion, is admissible, uh, in the impeachment setting. But, uh, to allow it to come in, uh, as direct evidence against the defendant, uh, is, is troubling. Do you have other cases where this has taken place? I believe it's fairly routine that, for instance, a, a, a trooper who arrests a defendant testifies as to what that defendant told him at the time of arrest, or a trooper who goes to investigate a crime and, and speaks volun-, with, with a witness voluntarily, uh, testifies as to what that defendant told him, even if the defendant ends up being charged and, and prosecuted for the offense. But the question, the next question. I, I don't have a case at hand because this was not an issue that was raised by the defense, either at trial or on appeal. There's no motion to exclude that statement for Miranda or some other reason? No. No. There, he was, he was clearly not in custody at any time. He, he, his cooperation with, or his willingness to discuss the, the issue with the trooper was, was clearly voluntary, Your Honor. If he knew that this was going to be, uh, testimony used against him at trial, he clearly, uh, would have conducted himself differently, I'm sure. He did know, in fact, that it, the encounter was being taped. That, that, that, when one listens to the tape, you hear the trooper both cautioning beforehand that, that the encounter is being taped. And, uh, and it's mentioned again at one point. Um, and speaking of what's on the tape, I, I, I'm puzzled by several factual, uh, representations that I would like to So, um, Honeycutt does, in the course of this conversation, clearly deny knowing Mark Graham. He, he, he says, say, I don't know who the guy was. I don't know what his last name is. Um, I, we went to his house purely by chance because I saw a flyer. He, and that's another fact. He did claim that he, he went to the house because he saw a flyer. Um, and that is contradicted by the fact that just, um, I believe it was 18 months to two years beforehand that, uh, Mark Graham had sold, or that Honeycutt had sold Graham a truck, and that there's written evidence of that fact. He, he was lying. He was lying in the course of his, of his, uh, explanation as to how he came into, uh, possession of that stolen rifle. If we were to, um, exclude the recording, uh, what evidence is, uh, left against, uh, the defendant? Um, the, the recording clearly was evidence, but the, there is, uh, Mr. Graham's testimony, which the jury was entitled to believe, about his encounter with and his, his sale of the stolen rifle to Mr. Honeycutt. Um, Graham, was, to be charitable, a difficult witness. He was, uh, he described himself as being a little bit slow sometimes, and, um, he was easily confused, and he came to the stand with a great deal of baggage, which the defense took full advantage of on cross-examination. Uh, and ultimately, the judge urged the jury to exercise caution in, in, uh, its consideration of Graham's testimony. But it's clear that they did believe him in the end, and that is the jury's conclusion. With Mr. Graham's testimony, he testified that Mr. Honeycutt, who he'd known for some time and who dropped by to visit every now and then, saw the rifle in his, in his, uh, home, said he wanted to buy it. Graham at first hesitated, but he needed some money, so he said, okay. And he sold him the, the rifle, along with a .22 that, um, that, uh, Mr. Honeycutt wanted to buy for his home. Um, he testified that at that time, he cautioned, uh, Honeycutt that the rifle was stolen, and that he shouldn't pawn it, because if he did, he might get caught. If the jury believed that, that was, that, that's clearly sufficient evidence to, uh, support the jury's verdict. Um, I, I think that that summary addresses the, the point of, that the defendant makes, that Mr. Graham's testimony should have been rejected by the jury. The defense made that argument at trial. The defense focused heavily on Mr. Graham and his, his, uh, credibility issues with the jury, and it lost. The, the jury did not buy it. And in fact, when you read Mr. Graham's testimony from beginning to end, you do see that he was, as, as I say, a difficult witness. But his story holds together. Um, and not only does it hang together, but it's corroborated in some respects, uh, for instance, by the, um, the, the, uh, receipt for the truck that he knew, um, Mr. Honeycutt and had some history with him. His explanation that, hey, I never put up any flyers. Everybody in town knew I was a felon, and why would I put up a flyer advertising that I had guns for sale? That makes certain degree of sense, even if you are, as, uh, Mr. Graham described himself, a little slow. Um, and, and some, I, um, I think that it's, it's difficult to fathom an argument on the first issue that a interview with a defendant who is on trial for possession of stolen, of a stolen weapon, in which that defendant explains how he claims he came into possession of that stolen weapon, isn't relevant to the case. It, it, it's clearly relevant. It clearly goes to issues that, that, uh, are in contest at trial. And the question of whether his use of profanity in the course of the tape was unduly prejudicial was one that's entrusted to the discretion of the district court. The district court listened to this tape twice, concluded that with a cautionary instruction, that it was not unduly prejudicial, and admitted the tape. And, and this court should respect that judgment. Unless the court has other questions, I, uh, thank you. Thank you. You had about, we'll make it just one minute for rebuttal here. I'm sorry? A minute for rebuttal. So, uh, coming up, Ms. Farrington made a comment that Mr. Honeycutt had lied about how he came across the rifle because his explanation was that he saw a flyer. Um, but it contradicted Mr. Graham's testimony that there was a sale of a car. And I'm, I don't think that the testimony that there was a sale of a car prior proves that Mr. Honeycutt lied when he said he saw a flyer. And so, um, then Mrs. Honeycutt was also, uh, a witness. She was also there the day that they had seen the flyer and went to the garage sale too. So I don't think that there's, that the, um, record, that the recording is relevant because, or that it shows that Mr. Honeycutt was lying. Also, just to explain, I don't have time to explain the physical place where this all took place, but it's common in the area of what's called the Butte, that people don't remember people's last names, their exact addresses. Sounds like an interesting place. Yes, very much so. But don't go there alone. Don't go there alone. Anyway, thank you very much. Thank you. United States Services, Honeycutt is submitted.
judges: Fletcher B. , Paez, Ikuta